1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11   MARIE E. HARRIS,                )   NO. EDCV 09-1689 SS
                                      )
12                  Plaintiff,        )
                                      )
13          v.                        )   **MEMORANDUM DECISION AND ORDER**
                                      )
14   MICHAEL J. ASTRUE,               )
     Commissioner of the Social       )
15   Security Administration,         )
                                      )
16                  Defendant.        )
     _____)

17

18                              **I.**

19                         **INTRODUCTION**

20

21        Marie  E.  Harris  ("Plaintiff")  brings  this  action  seeking  to

22   overturn  the  decision  of  the  Commissioner  of  the  Social  Security

23   Administration (hereinafter the "Commissioner" or the "Agency") denying

24   her application for Supplemental Security Income ("SSI") and various

25   other benefits administered by the Social Security Administration.  The

26   parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction

27   of  the  undersigned  United  States  Magistrate  Judge.   For  the  reasons

28   stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

On July 21, 2005, Plaintiff protectively filed applications for SSI and for benefits under other programs administered by the Social Security Administration. (Administrative Record ("AR") 19). She alleged disability due to depression, schizophrenia, bipolar disorder, multiple personality disorder, and suicidal thoughts. (AR 289). She originally alleged an onset date of November 22, 2003. (AR 284). That date was later amended to September 28, 2003. (AR 19, 753).

The Agency denied Plaintiff's claims on December 16, 2005. (AR 138-43). This denial was upheld upon reconsideration. (AR 146-49). On April 24, 2007, ALJ Don Harper ("ALJ Harper") conducted a hearing to review Plaintiff's claim. (AR 695). ALJ Harper denied benefits on May 25, 2007. (AR 123). Plaintiff sought review of the ALJ Harper's decision before the Appeals Council, which granted review and remanded the case on September 21, 2007. (AR 194-96). On August 27, 2008, ALJ Jerry Muskrat held a hearing on Plaintiff' s claim. (AR 748). ALJ Muskrat (hereinafter, "ALJ") denied benefits on October 1, 2008. (AR 18-25). The Appeals Council denied review on January 27, 2009. (AR 10). Plaintiff commenced the instant action on March 16, 2009.

//
//
//
//

2

### III.

### FACTUAL BACKGROUND

Plaintiff was born on March 19, 1970 and was thirty-eight years old at the time of the August 27, 2008 hearing.  (AR 755).  She had seven years of formal education and past relevant work as a car rental clerk and cashier.  (AR 19).

A.   **Plaintiff's Medical History**

Plaintiff's medical records show that she sought treatment from the San Diego County Mental Health Services during the period of September 2004 through November 2004.  (AR 571-581).  On September 9, 2004, a treating clinician diagnosed Plaintiff with bipolar II disorder, "rule out alcohol dependence", "rule out borderline personality disorder", and assessed a Global Assessment of Functioning ("GAF") score of 60 to 65. (AR 576).  On September 23, 2004, Plaintiff was assessed with the same GAF score.  The examiner also noted that it was difficult for Plaintiff to fully disclose her drug use, but that she admitted to drinking until she passed out and to continued use of methamphetamine and cocaine.  (AR 579).

On December 6, 2004, treating psychiatrist Trenton E. Moyer, M.D., completed a mental disorder questionnaire form regarding Plaintiff.  (AR 602-06).  He stated that Plaintiff reported seeing spirits and hearing voices.  (AR 604).  He diagnosed Plaintiff with personality disorder, not otherwise specified with cluster B traits and bipolar disorder, not otherwise specified.   He noted the need to rule out psychosis,

3

personality disorder, and dissociative identity disorder.   (AR 606).
Dr. Moyer issued a letter dated March 15, 2005, stating that Plaintiff
had "the following psychiatric diagnoses: bipolar disorder not otherwise
specified, borderline personality disorder and dissociative identity
disorder.   (AR 471).

Plaintiff sought treatment from psychiatric emergency services at
the Parkland Health & Hospital System in Dallas, Texas on December 15,
2005.   (AR 381).   The physician noted previous diagnoses of bipolar
disorder and dissociative identity disorder.   (AR 383).   She was
discharged with a diagnosis of psychotic not otherwise specified.   (AR
381).

On January 24, 2006, Plaintiff sought treatment from a licensed
counselor, who diagnosed Plaintiff with bipolar I disorder, noting that
the most recent episode was mixed with psychotic features.   (AR 426).
The clinician also noted the need to rule out dissociative identity
disorder and borderline personality disorder.   (Id.).   A GAF score of
50 was assessed.   (Id.).   A further record from the same date records
a current GAF score of 45.   (AR 500).

Medical records from the Denton County Mental Heath and Mental
Retardation Center from June 2006 reflect diagnoses of bipolar I
disorder; recurrent, severe major depressive disorder accompanied by
psychotic features; and borderline personality disorder.   (AR 509).   A
GAF of 60 was assessed.

4

Medical records show Plaintiff was treated at the Jane Westin Wellness and Recovery Center from May to July 2008. (AR 658-72). In May 2008 she was diagnosed with schizophrenia, paranoid type, and borderline personality traits were noted. (AR 670). It was also noted that Plaintiff was then-currently abusing alcohol and cocaine abuse was in sustained early remission. (Id.). She was assessed a GAF score of 40. (Id.). In July 2008 Plaintiff reported improvement and was again assessed a GAF score of 40. (AR 658).

**B.    Consultative Examinations**

Psychiatrist Douglas Englehorn, M.D., examined Plaintiff on November 23, 2004. (AR 582). Plaintiff reported depression and "rather vague psychotic-like symptoms." (AR 583). Dr. Engelhorn stated she was alert and cooperative, adequately dressed and groomed and of average intelligence. (Id.). There was no evidence of overt psychosis or active depression. (AR 584). Plaintiff exhibited no signs of cognitive impairment. (Id.). Dr. Engelhorn diagnosed Plaintiff with dysthemia, with the need to rule out psychotic disorder NOS. (Id.). He noted schizotype personality traits and assessed a GAF score of 55-65. (Id.).

Consulting physician David E. Gross, M.D., assessed Plaintiff in December 2004, finding her impairments not severe. (AR 588-601). Emanuel H. Rosen, M.D., reached the same conclusion in February 2005. (AR 609-622).

Plaintiff's mental status was assessed on October 20, 2005 by examining psychologist Randall Rattan, Ph.D. (AR 397-402). Plaintiff

reported symptoms associated with dissociative identity disorder, as well as extreme changes in mood and symptoms of depression. (AR 397-98). Dr. Rattan assessed her thought process as logical and goal-directed, her thought content as appropriate to mood and circumstances, and her general fund of information as good. (AR 400). She was alert and oriented, with normal attention, although she provided inappropriate responses when asked to describe how two items were alike. (Id.) Her immediate memory was intact, working memory was adequate, and short term memory was fair. (Id.) Her concentration was good and insight was average. (AR 400-01). Plaintiff was diagnosed with bipolar disorder not otherwise specified, provisionally, with the need to rule out dissociative identity disorder. (AR 401). She was assessed a then-current GAF of 56. (Id.).

In November 2005, Psychiatric Consultant Robert White assessed Plaintiff with bipolar disorder and dissociative identity disorder. (AR 407, 411). He noted mild restriction of daily living activities, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and no extended episodes of decompensation. (AR 414). He noted that Plaintiff alleged limitations from depression, schizophrenia, bipolar disorder, multiple personality disorder, and suicidal ideation. (AR 416). Plaintiff was neat and clean, speech was normal, and she was cooperative. (Id.). Her thinking was logical, ordered, goal-oriented, and appropriate. (Id.). She had a "somewhat restricted" affect and was sad. (Id.). He further noted that Plaintiff's alleged limitations from mental illness were partially supported but not to the degree alleged, and therefor found her alleged limitations not wholly credible. (Id.).

6

The November 2005 Mental Residual Functional Capacity Assessment found Plaintiff not significantly limited in the following abilities: remembering locations and work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; making simple work-related decisions; interacting appropriately with the general public; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. (AR 418-19). Plaintiff was moderately limited in the following abilities: maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; working in coordination with or proximity to others without being distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting. (Id.). Plaintiff had marked limitations in the following abilities: understanding and remembering detailed instructions and carrying out detailed instructions. (AR 418). Her functional capacity assessment concluded that Plaintiff was "able to understand, remember, and carry out simple instructions, make simple decisions,

concentrate for extended periods, interact with others, and respond to changes."  (AR 420).

Gregory M. Nicholson, M.D., assessed Plaintiff in May 2008.  (AR 641).  Plaintiff reported symptoms associated with depression and stated that she had attempted suicide.  (AR 641).  She also reported a diagnosis of bipolar disorder and manic episodes accompanied by increased energy and racing thoughts.  (Id.).  She denied a history of psychotic symptoms.  (AR 642).  She denied a history of alcohol or drug abuse, even though her alcohol and drug abuse is well-documented.  (Id.).  Dr. Nicholson noted that Plaintiff's thought processes were coherent and organized, with "no bizarre or psychotic thought content."  (AR 643).  Her mood was depressed and her affect dysphoric.  (AR 644).  Dr. Nicholson diagnosed Plaintiff with bipolar disorder not otherwise specified, currently depressed; and anxiety disorder not otherwise specified.  (AR 645).  He assessed a GAF of 60.  (Id.).  He asserted that Plaintiff could understand, remember, and carry out simple one- or two-step instructions, including detailed and complex instructions.  (AR 646).  She had moderate limitations in the following areas: ability to interact with co-workers and the public; ability to maintain concentration and attention, persistence and pace; ability to associate with day-to-day work activity; ability to maintain regular attendance in the workplace and perform work on a consistent basis; and ability to perform work activities without special or additional supervision.  (Id.)  She was mildly limited in her ability to accept instructions from supervisors.  (Id.).

//

8

1   **C.    Third-Party Report**

2

3      Jacquelyn D. Owens, Plaintiff's daughter (see AR 695), submitted
4   a report dated September 4, 2004, describing how Plaintiff's conditions
5   limited Plaintiff's activities.  (AR 37).   Ms. Owens asserted that
6   Plaintiff's daily activities consisted of laying in bed, then getting
7   up and cleaning or occasionally going outside. (Id.).  Plaintiff, with
8   some assistance, cared for Ms. Owens and a guinea pig. (AR 38).  Ms.
9   Owens reported that, since the onset of Plaintiff's illness Plaintiff
10  had not been able to clean as well, not been as "benev[o]lent," and had
11  memory troubles.   (Id.).   Her sleep was also affected.   (Id.).
12  Plaintiff occasionally needed to be reminded to take her medicine. (AR
13  39).  Plaintiff prepared food weekly, but not as often as she used to.
14  (Id.).   Plaintiff did laundry but it took her three to four days to
15  complete the task.    (Id.).    Plaintiff could walk, use public
16  transportation, and drive, but did not go out alone because of "drama."
17  (AR 40).  She could shop and handle money. (Id.).  She had some hobbies
18  and socialized on the phone, but did not go out regularly and had
19  trouble getting along with others, including authority figures (AR 40,
20  41).    Ms. Owens reported that plaintiff's condition affected her
21  talking, hearing, seeing, memory, ability to complete tasks,
22  concentration, understanding, ability to follow instructions, and
23  ability to get along with others.  (AR 42).  Plaintiff had trouble
24  following both written and verbal instructions. (Id.).  According to
25  the report, Plaintiff did not handle stress well. (AR 43).

26

27  //

28  //

9

**D.   Plaintiff's Testimony**

At the August 27, 2008 hearing, after the Appeals Council remanded the case, Plaintiff testified that she had begun but not completed eighth grade. (AR 755). She stated that she had attended some community college. (AR 756). She also had received training as a bank teller and in business management. (AR 757-58). Plaintiff testified that she had been employed as a car rental agent (AR 759-61), a cashier (AR 761), an accounting clerk (AR 762), a receptionist (AR 763, 770), a series of short-term temporary jobs (AR 763-64), an office manager (AR 764), and a hand packager. (AR 767-68).

In 2004, Plaintiff moved from California to Texas, where she received treatment at Denton County Mental Health. (AR 789, 790). After moving back to California from Texas in 2007, she began receiving treatment at the Jane Weston Wellness Clinic. (AR 789-90, 791). Plaintiff testified that she was currently homeless and had been for about one month. (AR 787-88). She had recently been kicked out of a shelter because of a verbal altercation. (AR 788). Plaintiff testified that the last illegal drug she used was marijuana in March or April 2008. (AR 791). Prior to that time period, she used cocaine most recently in February 2008. (AR 791-92). She admitted to using methamphetamine. (AR 792).

Regarding her symptoms, Plaintiff reported feeling depressed, sad, and confused. (AR 794). She further stated that she also felt angry and confrontational, and sometimes had episodes of excitement. (Id.).

According to Plaintiff, she occasionally heard voices.  (AR 794-95).
Her symptoms interfered with her concentration.  (AR 796).

**E.   Medical Experts' Testimony**

Two medical experts testified at the August 26, 2008 hearing.  Dr.
Miriam Sherman testified that Plaintiff had the following severe mental
impairments: bipolar disorder not otherwise specified, anxiety disorder
not otherwise specified, and polysubstance abuse.  (AR 775).  These
impairments did not precisely satisfy the diagnostic criteria.  (AR
777).  She testified that Plaintiff did not have severe schizoaffective
disorder, schizophrenia paranoid type, personality disorder, or
somatoform disorder.  (AR 776).  Dr. Sherman found that Plaintiff's
mental impairments mildly restricted her activities of daily living and
her ability to maintain concentration and moderately restricted her
ability to maintain social functioning.  (AR 778).  If the effects of
Plaintiff's substance abuse were removed, all restrictions would be
mild.  (AR 780).  There were no episodes of decompensation.  (Id.).
Plaintiff's combination of symptoms limited her to simple, non-public
repetitive tasks.  (AR 779).  Dr. Sherman opined that Plaintiff's
condition was likely to improve with treatment within eighteen months.
(Id.).

During questioning by Plaintiff's attorney, Dr. Sherman stated that
given the use of alcohol and methamphetamine, it was difficult to
determine which symptoms were caused by the substance abuse and which
by the bipolar disorder.  (AR 781).  Examining Plaintiff's history of
GAF scores, which were generally over 50, Dr. Sherman stated that "the

bottom line functional level has been remarkably high." (AR 781-82). Regarding Plaintiff's GAF score of 40, assessed in May 2008, as well as a GAF score of 50 or below in January 2006, Dr. Sherman noted that the low score was likely due in part to the ongoing substance abuse. (AR 782-83). Substance abuse was similarly the cause of Plaintiff's occasional psychotic features, such as visual and auditory hallucinations. (AR 784). Dr. Sherman also opined that Plaintiff would be able to sustain a standard work week with the limitations previously set forth. (AR 786).

Dr. John Morse testified as to Plaintiff's physical impairments, finding that Plaintiff's gastritis was a severe medically determinable physical ailment under the regulations. (AR 798). He discounted Plaintiff's claims of insomnia, a heart condition, and migraine headaches either because they did not have a physical basis or they were not supported by the medical records. (AR 799). Dr. Morse opined that Plaintiff's gastritis was not sufficiently severe to impose limitations on her ability to work. (AR 800).

**F.   <u>Vocational Expert's Testimony</u>**

Vocational Expert ("VE") Kathleen Macy-Powers testified that Plaintiff could not perform any of her past relevant work as a car rental clerk or cashier if she were limited to non-public simple repetitive tasks. (AR 369, 803). She noted that Plaintiff was a younger individual with limited formal education, ineligible for direct entry in to skilled work, with no transferrable skills. (AR 804). There would be "significant erosion" on the occupational base given the

1   limitations in Plaintiff's residual functional capacity.   (AR 805).
2   Nonetheless, the VE found that there a significant number of jobs
3   remaining in the occupational base that Plaintiff could perform.   (AR
4   805).   Plaintiff provided three examples: industrial cleaner, painter,
5   and dishwasher.   (AR 806).

6

7                                **IV.**

8              **THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

9

10      To qualify for disability benefits, a claimant must demonstrate
11  a medically determinable physical or mental impairment that prevents him
12  from engaging in substantial gainful activity[1] and that is expected to
13  result in death or to last for a continuous period of at least twelve
14  months.   Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing
15  42 U.S.C. § 423(d)(1)(A)).   The impairment must render the claimant
16  incapable of performing the work he previously performed and incapable
17  of performing any other substantial gainful employment that exists in
18  the national economy.   Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.
19  1999) (citing 42 U.S.C. § 423(d)(2)(A)).

20

21      To decide if a claimant is entitled to benefits, an ALJ conducts
22  a five-step inquiry.   20 C.F.R. §§ 404.1520, 416.920.   The steps are as
23  follows:

24

25

26  _____

27      [1]   Substantial gainful activity means work that involves doing
    significant and productive physical or mental duties and is done for pay
28  or profit.   20 C.F.R. §§ 404.1510, 416.910.

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing her past work?  If so, the claimant is found not disabled. If not, proceed to step five.

(5)   Is the claimant able to do any other work? If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1); Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted).

In order to satisfy step three and meet a listing for a mental disorder, "a claimant must satisfy criteria in paragraph A of the listings, which medically substantiate the presence of a mental

14

disorder, and the criteria in paragraphs B or C, which describe the functional limitations associated with the disorder which are incompatible with the ability to work." <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1203 (9th Cir. 2001).   In order to satisfy the criteria in paragraph B, a plaintiff's impairments must result in "'at least two of the following':

1.   Marked restriction in the activities of daily living; or
2.   Marked difficulties in maintaining social functioning; or
3.   Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4.   Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors)."

<u>Id.</u> at 1203-04.   To satisfy paragraph C, a plaintiff must have had one of the following, depending on the disorder: (1) repeated episodes of decompensation; (2) marginal adjustment such that a minimal increase in mental demands or a change in the environment would cause decompensation; (3) an inability to function outside of a highly supportive living arrangement; or (4) a complete inability to function independently outside of the home.   <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04C; <u>id.</u> at § 12.06C.

15

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. <u>Bustamante</u>, 262 F.3d at 953-54. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education, and work experience. <u>Tackett</u>, 180 F.3d at 1098, 1100; <u>Reddick</u>, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). The Commissioner may do so by the testimony of a VE or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a VE. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1208 (9th Cir. 2001).

## V.

## THE ALJ'S DECISIONS

The ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 24-25). At the first step, the ALJ found that "a decision on whether [Plaintiff] is disabled cannot be made on work-related activity" because Plaintiff's only employment subsequent to her alleged onset date were unsuccessful work attempts. (AR 19). Thus, she had not engaged in substantial gainful activity since the claimed onset date of September 28, 2003. (AR 23). Next, he found that Plaintiff did not have a severe physical impairment, but did have a combination of

severe mental impairments that imposed significant work-related limitations. (Id.). These severe mental impairments were bipolar disorder not otherwise specified, anxiety disorder not otherwise specified, and substance addiction disorder. (AR 22, 23). At the third step, he found that Plaintiff's impairments did not meet or medically equal one of the listed impairments. (AR 22, 23). At step four, the ALJ found that Plaintiff could perform "simple repetitive tasks in a nonpublic setting." (AR 22, 24). At step five, the ALJ found that Plaintiff could not perform her past relevant work, but that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (AR 19, 24). In particular, the ALJ concluded that Plaintiff could perform the job requirements of industrial cleaner, painter, and dishwasher. (AR 23, 24). Thus, Plaintiff was not disabled. (AR 23, 24-25).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when his findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720. It is "relevant evidence which a reasonable person might accept as adequate to support a

conclusion." Id.   To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).   If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21.

## VII.

### DISCUSSION

Plaintiff contends that there are several errors in the Commissioner's decision.   First, she claims that the ALJ did not properly consider Dr. Moyer's March 15, 2005 letter. (Jt. Stip. at 3-6).   Second, she claims that the ALJ did not properly consider the treating clinician's January 24, 2006 opinion. (Id. at 6-9).   Third, she claims that the ALJ did not comply with the Appeals Council's remand order.   (Id. at 9-13).   Fourth, she asserts that the ALJ did not properly consider the state agency's findings regarding Plaintiff's multiple moderate and marked limitations. (Id. at 13-16).   Fifth, she asserts that the ALJ posed an incomplete hypothetical to the VE. (Id. at 16-18).   Sixth, she asserts that the ALJ improperly found that Plaintiff could perform the jobs of industrial cleaner, painter, and dishwasher. (Id. at 18-23).   For the reasons discussed below, the Court disagrees with all of Plaintiff's contentions.

//

18

**A.     The ALJ Properly Considered Treating Physician Moyer's Opinion**

Plaintiff argues that the ALJ erred by failing to discuss the March 15, 2005 letter from Dr. Moyer asserting that Plaintiff suffered from "bipolar disorder not otherwise specified, borderline personality disorder and dissociative identity disorder." (Jt. Stip. at 3; AR 471).

The ALJ may not reject significant, probative evidence without explanation. <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984). This does not mean, however, that the ALJ must discuss every piece of evidence presented. <u>See id.</u> ("The Secretary, however, need not discuss <u>all</u> evidence presented to her."). Nor does it mean that a reviewing court is "deprived of [its] faculties for drawing specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755 (9th Cir. 1989). Although the treating physician's opinion is entitled to great deference, it is "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999). "When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict." <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1019 (9th Cir. 1992). The ALJ may reject a treating physician's opinion in favor of a conflicting opinion of an examining physician if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. <u>Magallanes</u>, 881 F.2d at 751. In addition, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings. <u>See Matney</u>, 981 F.2d at 1019.

1    Here, the fact that the ALJ did not specifically mention Dr.
2    Moyer's letter does not require remand.  First, it is clear that in
3    determining Plaintiff's diagnoses of bipolar disorder, anxiety disorder,
4    and substance addiction disorder, the ALJ reviewed the record and
5    properly resolved ambiguities or conflicts in the medical evidence.  The
6    ALJ relied on the testimony of medical expert Dr. Sherman.  (See AR 20-
7    21).  At the hearing, Dr. Sherman addressed Dr. Moyer's December 6, 2004
8    report and opined that it would not affect Plaintiff's overall diagnosis
9    because the reported symptoms of psychosis were not ongoing and because
10   they were associated with the use of alcohol or methamphetamine.  (AR
11   783-84).  The ALJ also specifically referenced the report of examining
12   psychiatrist Dr. Engelhorn from November 2004, which "found no evidence
13   of overt psychosis" (AR 21), in part because Plaintiff was unable to
14   describe her "rather vague psychotic-like symptoms."  (AR 583, 584-85).
15   Thus, the ALJ gave clear reasons for discounting any conflicting
16   diagnoses of psychosis, like those included in Dr. Moyer's March 15,
17   2005 letter.

18

19   Second, even if the ALJ had failed to properly consider Dr. Moyer's
20   March 15, 2005 letter, the error would have been harmless as the outcome
21   would have been the same.  See Curry v. Sullivan, 925 F.2d 1127, 1129
22   (9th Cir. 1990) (harmless error rule applies to review of administrative
23   decisions regarding disability); Booz v. Sec'y of Health and Human
24   Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984) (same).  Dr. Moyer's
25   letter contained mere unsupported conclusions; thus the ALJ was under
26   no obligation to accept or credit it.  See Magallanes, 881 F.2d at 751
27   (finding that the ALJ need not consider conclusory opinions); cf. Crane
28   v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (holding that the ALJ

20

properly rejected doctor's opinion because they were check-off reports that did not contain any explanation of the bases of their conclusions). There is no need to remand on this issue.

**B.   The ALJ Properly Considered The Treating Clinician's Opinion**

Plaintiff asserts that the ALJ erred by failing to mention a Texas Department of Mental Health and Mental Retardation treating clinician's January 24, 2006 report stating that Plaintiff suffered from "bipolar disorder, most recent episode with psychotic features," rule out dissociative identity disorder, and a GAF score of 50.  (Jt. Stip. at 6; AR 426).

Because treating clinicians are "other sources" pursuant to 20 C.F.R. section 404.1513(d), an ALJ is entitled to accord them "less weight than opinions from acceptable medical sources."  Gomez, 74 F.3d at 970-71.  Although the ALJ did not explicitly discuss or reject the clinician's assessment, the ALJ's failure to address every single item in the administrative record does not constitute legal error.  An ALJ need not expressly discuss all of the evidence presented.  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) ("[I]n interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence." (internal quotation marks and citations omitted)).

Further, here, as above, it is clear that the ALJ reviewed the record and properly resolved ambiguities or conflicts in discounting evidence of psychosis in the medical evidence.

Finally, to the extent Plaintiff complains that the ALJ did not expressly state whether he accepted or rejected the GAF score of 50, there is no error.  GAF scores are not dispositive in social security cases.  See 65 Fed. Reg. 50746, 50765 (August 21, 2000) (GAF scores are not directly correlative to Social Security severity assessments).  A GAF score is only intended to be used to plan treatment and measure its impact.  See DSMV IV, at 32.  The ALJ's failure to explicitly accept or reject the GAF score in the report does not, by itself, make the assessment inaccurate.  See Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.  Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."); see also Brewster v. Barnhart, 366 F. Supp. 2d 858, 876 (E.D. Mo. 2005) (citing Howard).  No remand is required.

**C.  The ALJ Complied With The Appeals Council's Remand Order**

Plaintiff claims that the ALJ did not comply with the Appeals Council's remand order.  Plaintiff specifically cites the following two sentences:

The Disability Determination Services non-examining sources concluded that the claimant has a severe mental impairment and that she has moderate restrictions of activities of daily living, moderate difficulties maintaining concentration; persistence and pace; no episodes of decompensation.

1        (Exhibit  6F).    The  decision  does  [not]  refer  to  this

2        opinion."

3

4   (Jt. Stip. at 9-10; see AR 194).  This contention is meritless.

5

6        First, Plaintiff has taken the sentences out of context.  The

7   paragraph of the remand order in which the cited sentences appear begins

8   by taking issue with ALJ Harper's conclusion that Plaintiff had severe

9   bipolar disorder, noting that the section of ALJ Harper's decision

10  regarding the paragraph B criteria indicates a non-severe impairment.

11  (AR 194; see also AR 117-18).  It concludes by stating that "[f]urther

12  evaluation of the claimant's mental impairment is needed."  (AR 194-95).

13  Thus, the gravamen of that paragraph is that there is a conflict in ALJ

14  Harper's decision as to whether Plaintiff's mental disorder was severe;

15  therefore, on remand, the ALJ must resolve that conflict.   That

16  conclusion is reinforced in the section of the remand order discussing

17  what the ALJ must do on remand, which focuses on the need to update and

18  supplement the administrative record in order to re-evaluate Plaintiff's

19  claim of disability.[2]  (AR 195-96).

20

21        [2]  The Commissioner's assertion that the ALJ did, in fact, discuss

22  the report at issue is not supported by the record.  The Commissioner

23  asserts that, when the ALJ referred to Exhibit 6B in his discussion of

    state agency findings denying Plaintiff's disability, he must have meant

24  Exhibit 6F, because Exhibit 6B is "a letter to Plaintiff," whereas

    Exhibit 6F "contains the State agency's finding regarding Plaintiff's

25  mental limitations."  (Jt. Stip. at 11; see also AR 138-43, 404-17).

    This is mere conjecture.  Moreover, in that same section, the ALJ cites

26  Exhibit 8B, which, like Exhibit 6B, is a letter from the state agency

27  explaining that Plaintiff had been denied benefits.  (See AR 22; see

    also AR 138-43, 146-49).  Thus, it is equally likely that when the ALJ

28  cited Exhibit 6B he was actually referring to that exhibit.

The ALJ complied with the remand order.  As the Commissioner points out, the ALJ considered supplemental psychiatric evidence that post-dated ALJ Harper's May 25, 2007 decision.  (AR 123).  Specifically, the ALJ discussed medical records from May 2008, as well as Dr. Nicholson's evaluation from that same month.  (AR 20, 21; see also AR 657-75).  The ALJ also took the testimony of Dr. Sherman, who reviewed Plaintiff's medical history and provided her opinion on the issue of Plaintiff's diagnoses.  (AR 775-86).  Thus, the ALJ complied with the Appeals Council's remand order to supplement the record and re-evaluate Plaintiff's claim.

Moreover, even if the ALJ failed to obey the letter of the remand order, the error would have been harmless as the outcome would have been the same.  See Curry, 925 F.2d at 1129 (harmless error rule applies to review of administrative decisions regarding disability); Booz, 734 F.2d at 1380-81 (same).  The document allegedly ignored is largely a check-off report dated November 25, 2005, which the ALJ was not required to credit.  (AR 404-16); See Crane, 76 F.3d at 253 (holding that the ALJ properly rejected doctor's opinion because they were check-off reports that did not contain any explanation of the bases of their conclusions).  The only narrative included is in the "Consultant's Notes," which undercut Plaintiff's claims of mental illness, stating that Plaintiff's "alleged limitations from mental illness are partially supported . . . but not to the degree alleged.  Therefore [Plaintiff's] alleged limitations are not [found] wholly credible at this time."  (AR 416).  Finally, as explained more fully in Section VII.D, below, the Mental Residual Functional Capacity Assessment, performed by the same consultant on the same day, comes to conclusions that are largely

consistent with the ALJ's assessment of Plaintiff's limitations.  To the extent that they differ, the ALJ found more extensive limitations. (Compare AR 420 (Consultant's assessment) with AR 22 (ALJ's assessment)).  Thus, there is no error.

**D.**   **The ALJ Properly Considered The State Agency's Findings Regarding Plaintiff's Moderate And Marked Limitations**

Plaintiff states that the ALJ erred by ignoring without explanation the state agency Mental Residual Functional Capacity Assessment from November 21, 2005, which assessed Plaintiff as moderately limited in maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; working in coordination with or proximity to others without being distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and responding appropriately to changes in the work setting.  (Jt. Stip. at 13; AR 418-19).

The ALJ's failure to explicitly reference the Mental Residual Functional Capacity Assessment does not mean that the ALJ failed to consider or credit it.  Vincent, 739 F.2d at 1394-95; Howard, 341 F.3d at 1012.  Here, the ALJ's ultimate evaluation of Plaintiff's functional capacity was largely consistent with the state agency physician's

findings.  The Mental Residual Functional Capacity Assessment concludes that, with all of the moderate limitations listed above, Plaintiff could "understand, remember, and carry out simple instructions, make simple decisions, concentrate for extended periods of time, interact with others, and respond to changes."  (AR 420).  The ALJ similarly found that Plaintiff was capable of performing "simple, repetitive tasks in a nonpublic work setting."  (AR 22).  Thus, the ALJ's assessment of Plaintiff's limitations included the limitations mentioned in the Mental Residual Functional Capacity Assessment, but was <u>more</u> restrictive, limiting Plaintiff to non-public work.  In such a case, this Court may draw the reasonable inference that the state agency's Mental Residual Functional Capacity Assessment was considered and credited.  <u>Magallanes</u>, 881 F.2d at 755 ("As a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion.").  No remand is required on this issue.

**E.   The ALJ Posed A Complete Hypothetical To The Vocational Expert**

Plaintiff asserts that the ALJ posed an incomplete hypothetical to the Vocational Expert when he "fail[ed] to set out the factors bearing on Plaintiff's multiple moderate and marked mental limitations" set forth by the state agency.  (Jt. Stip. at 17).  This Court disagrees.

In order for the vocational expert's testimony to constitute substantial evidence, the hypothetical question posed must "derive[] from the [Residual Functional Capacity] [and] must set out all the limitations and restrictions of the particular claimant."  <u>Valentine v. Comm'r of Soc. Sec. Admin.</u>, 574 F.3d 685, 690 (9th Cir. 2009).  The ALJ

26

is not required to include limitations for which there was no evidence. See Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001) (ALJ not bound to accept as true the restrictions set forth in hypothetical if they were not supported by substantial evidence).

Here, the ALJ together with the VE established Plaintiff's vocational profile, including age, education, and work experience. (AR 804). He also referred to Plaintiff's Residual Functional Capacity limitation to non-public simple repetitive tasks. (AR 803). As discussed above in Section VII.D, the state agency's assessment of Plaintiff's moderate and marked limitations supported the assessment. The ALJ then asked the VE to determine whether the Residual Functional Capacity limiting Plaintiff to simple, repetitive nonpublic tasks would erode the occupational base. (AR 805). This hypothetical was consistent with Plaintiff's Residual Functional Capacity and captured the limitations which were supported by substantial evidence.

**F.   The ALJ Properly Determined Plaintiff Capable Of Performing The Jobs Of Industrial Cleaner, Painter, and Dishwasher**

Plaintiff argues that the ALJ erred in determining that Plaintiff was capable of performing the job duties of industrial cleaner, painter, and dishwasher because, in making the determination, the ALJ did not consider Plaintiff's November 21, 2005 Mental Residual Functional Capacity Assessment that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions and moderately limited in her ability to maintain attention and concentration for extended periods, work in coordination with or

27

proximity to others without being unduly distracted, perform activities within a schedule, maintain regular attendance, be punctual, accept instruction and respond appropriately to criticism from supervisors, get along with coworkers or peers, and respond appropriately to changes in the work setting. (Jt. Stip. at 19). Plaintiff points out that all three jobs as defined in the Dictionary of Occupational Titles ("DOT"), require Plaintiff to function at reasoning level 2, which, in turn, requires the ability to "apply commonsense understanding to carry out detailed but uninvolved written and oral communications [and] [d]eal with problems involving a few concrete variables in or from standardized situations." (Id. at 19-20; see also id., Exhs. A, B, C). Specifically, Plaintiff points out that she has "marked" limitation in the ability to understand, remember, and carry out detailed instructions, and the three jobs mentioned require the ability to carry out detailed instructions. (Id. at 23).

The ALJ may rely on expert testimony that contradicts the DOT if the records contains persuasive evidence to support the deviation. See Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995); Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008). Here, however, Plaintiff's limitations to simple repetitive work are consistent with a reasoning level of 2. As Plaintiff notes, jobs with a reasoning level of 2 require the ability to "carry out detailed but uninvolved" instructions. In Meissl v. Barnhart, 403 F. Supp. 2d 981 (C.D. Cal. 2005), the district court parsed the meaning of the phrase "detailed but uninvolved" in the DOT. In that case, as here, the ALJ found that the Plaintiff could perform simple repetitive tasks. The court noted that a DOT reasoning level of 1 "appl[ies] only to the most elementary of

occupations; only the slightest bit of rote reasoning being required." Id. at 984.  The reasoning required to perform simple repetitive tasks requires more than this level of reasoning.  Id.  Although reasoning level 2 states that "the worker must be able to follow 'detailed' instructions, it also . . . downplay[s] the rigorousness of those instructions by labeling them as being 'uninvolved.'" Id.  A similar analysis applies here.  The ALJ found that the marked limitations on Plaintiff's ability to understand, remember, and carry out detailed instructions supported the conclusion that Plaintiff was capable of performing simple, repetitive tasks.  However, the Plaintiff's limitations did not render her incapable of performing a job requiring the understanding to carry out "detailed but uninvolved" instructions contemplated by reasoning level 2.  Remand is therefore unnecessary on this issue.

## VIII.

### CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g), IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: April 21, 2010.

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

29